UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CHARLES R. MCNICHOLS,                                                    Plaintiff

v.                                             Civil Action No. 3:17-CV-P688-RGJ

N.P. CHRISTINA LYONS, *et al.*                                        Defendants

* * * * *

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Correct Care Solutions, LLC ("CCS"), Christina Lyons ("Lyons"), and Anne Jones ("Jones," collectively "Defendants") Motion to Dismiss for Lack of Prosecution and/or for Summary Judgment [DE 57].  Plaintiff Responded [DE 61; DE 62; DE 63], Defendants Replied [DE 68], and Plaintiff filed a sur-reply [DE 72].[1]  For the following reasons, Defendants Motion to Dismiss for Lack of Prosecution [DE 57] is **DENIED** and Defendants' Motion for Summary Judgment [DE 57] is **DENIED**.

## I.      Background

Plaintiff was incarcerated at the Kentucky State Reformatory ("KSR") during most of the time pertinent to the complaint.  CCS is the medical provider at KSR, and Lyons and Jones, who are sued in their individual capacities, are two CCS Nurse Practitioners who worked at KSR.  On initial review of Plaintiff's amended superseding complaint [DE 13], the Court allowed Plaintiff's Eighth Amendment claims that Defendants were deliberately indifferent to a serious medical need when they repeatedly transferred him throughout the state to delay treatment related to his ears/hearing and by failing to respond to his sick call requests within the proper timeframe.  [DE 31].

---

[1] Plaintiff was given an opportunity to file a supplemental response to Defendants' motion [DE 74] but did not do so.

Plaintiff has had a long history of problems with his ears.  He alleged and the exhibits he attached to his amended complaint show that in September 2014 he had tympanoplasty and mastoidectomy surgery on his left ear.[2]  [DE 13-1 at 53].  He alleged that he was scheduled for a revision tympanoplasty/mastoidectomy "surgery, Feb/Mar 2015! It did not occur b/c I was transferred in midst of treatment . . . at Mo[]rehead Clinic in Mo[]rehead, Ky" to Luther Luckett Correctional Complex (LLCC) at the end of 2014.[3]   [*Id.* at 51].   Plaintiff alleged that once he was housed at LLCC he was not sent back to Dr. Raleigh Jones at the Morehead Clinic because it  was too far to travel.  [*Id.* at 52 ("[LLCC] lied intentionally over the 100 mile radius which proves delay in my treatments and the neglect by CCS scheduling NP Anna Jones.").].

Plaintiff attached documents showing that he did have the revision surgery in November 2015, which was performed by Dr. Jones at University of Kentucky (UK) Healthcare in Lexington, Kentucky.  [DE 13-4 at 75].   On March 18, 2016, Dr. Jones found that Plaintiff was healing well and that there was "no sign of any recurrent cholesteatoma."[4]   [*Id.* at 83].   The doctor's note also stated that Plaintiff needed "to be followed by an otolaryngolist for a microscopic exam of his ear every 4 months or so for at least the next 5 years."  [*Id.*].   That note further stated that Plaintiff had mixed hearing loss in his left ear and sensorineural hearing loss in his right ear.  [*Id.*].

The records attached to the amended complaint show that in September 2016, Plaintiff was seen at University of Louisville (UofL) Physicians for a new patient appointment.  [*Id.* at 138].   At that time, Plaintiff reported "a significant decrease in his hearing on the left side over the past several years."  [*Id.* at 140].   The summary stated that Plaintiff would be started

---

[2]  A mastoidectomy is surgery to remove an infection from behind the mastoid bone in the ear. www.webmd.com.  Tympanoplasty is eardrum-repair surgery.  *Id.*

[3]  It appears that at the time he was treated at the Morehead Clinic he was housed in the Eastern Kentucky Correctional Complex in West Liberty, Kentucky.  [DE 13-4 at 73; DE 59 at 186].

[4]  A cholesteatoma is a benign ear cyst.  www.webmd.com.

on antibiotics and that a CT scan of his sinuses related to nasal obstruction and an audiogram were ordered. [*Id*. at 138].

The attachments further show that, on October 27, 2016, Plaintiff was again seen at UofL. [DE 13-5 at 147]. At that time, Plaintiff was to be scheduled for septoplasty and sinus irrigation with Dr. Kevin Potts. [*Id*. at 148]. The summary note for that visit stated in pertinent part, "Will need possible otologic intervention however I feel surgical intervention for the nose takes priority as I am concerned for OSA."[5] [*Id*.]

In a grievance attached to the amended complaint, Plaintiff stated that he saw a nurse practitioner at LLCC, who, according to Plaintiff, told him he would not be scheduled for surgery because he wanted to "do some kind of test of his own" despite the UofL doctor's recommendation to have sinus surgery "A.S.A.P." due to possible sleep apnea. [DE 13-4 at 112]. The amended complaint alleges that Plaintiff was then transferred to KSR in December 2016 in the "midst of treatments" [DE 13-1 at 53], and that on February 9, 2017, Plaintiff had septoplasty surgery by a UofL doctor. [DE 13-4 at 125-26].

On February 13, 2017, he was seen by UofL Physicians for a follow up appointment which noted, "referral to otology in [A]pril." [*Id*. at 119]. Another attachment showed that Plaintiff was seen by Dr. Potts at UofL Physicians on April 10, 2017. [*Id*. at 122]. Dr. Potts's recommendation was "follow up PRN." [DN 13-5 at 155].

The amended complaint continues, "While at KSR after septoplasty[6] surgery was to go back to UofL physicians, but I 'supposedly' had written a threatening letter of UofL physicians, then it went to threatening staff while at Dr. visit. None of this occurred . . . UofL physicians wanted me to come back when I got out on parole!" [DE 13-1 at 53]. A CCS medical note

---

[5] "OSA" appears to refer to obstructive sleep apnea. www.webmd.com.
[6] Septoplasty is surgery to straighten the septum of the nose. www.webmd.com.

from Defendant Lyons on June 16, 2017, noted "discussed with inmate no further f/u with otology medically indicated, informed inmate of results of MRI and inmate insists he is to follow up with ENT, however, he has been cleared by ENT from UofL post surgery.   Inmate without new complaint or symptom.  f/u with ENT prn."  [DE 13-5 at 162].    Attached to the amended complaint is a July 13, 2017, CCS medical note from Defendant Lyons which detailed that Plaintiff had been "discharged from UofL ENT practice for writing threatening letters to staff at that office," and next to which Plaintiff has written a handwritten note: "never occurred."  [*Id.* at 159].

The amended complaint stated that Defendant Lyons did send him to a specialist and that "he start[ed] tests, recc treatments, then surgery.  In meantime appts for test were set in wrong by CCS.  Trips to outside provider where I was sent to was wrong dates and wrong office, causing delays in my treatments, etc."  [DE 13-1 at 53].

On August 8, 2017, Defendant Lyons referred Plaintiff to otolaryngology for evaluation and treatment for "poss cholesteotoma, recurrence."  [DE 13-5 at 164].   A September 6, 2017, CCS note confirms that Plaintiff "cannot return to UofL ENT due to harassing behavior," [*Id.* at 159], and states that Plaintiff was due for a follow up visit that month with Dr. Morris.   [*Id.* at 160]  A report dated September 25, 2017, from Dr. Morris noted that Plaintiff was supposed to be seen in the Dupont office, but he was instead scheduled at the Brownsboro office.   Yet, Plaintiff was seen on that date; the diagnosis was "profound [sensorineural hearing loss], otalgia rt. ear." [*Id.* at 146].

An attachment to the amended complaint documents that on October 12, 2017, Plaintiff had a CT scan done on his sinuses at Baptist Health with findings of "[m]inimal mucosal thickening in the right maxillary sinus.   Paranasal sinuses are otherwise normal" and "[b]ilateral

depressed nasal fracture deformities" were present.   [DE 13-4 at 109].   Plaintiff saw the ENT specialist (whose signature is illegible) on October 19, 2017, who diagnosed "profound HLAS, profound deafness[;] r/o cholesteatoma" and ordered a follow-up in one month.   [*Id.* at 135]. Plaintiff was seen again by the ENT specialist on January 29, 2018, who diagnosed "chronic mastoditis, BPPV?" [*Id.* at 136].

On April 2, 2018, Plaintiff was seen by Dr. Morris at Advanced ENT and Allergy in Louisville.   [*Id.* at 91, 95].   Dr. Morris noted "Schedule Surgery" for left tympanomastoid, stating, "We discussed meatoplasty[7] to the left ear to decrease the occurrence of infection and otorrhea."[8]   [*Id.* at 95].   He had a left tympanoplasty/mastoidectomy performed by Dr. Morris on April 25, 2018.   [*Id.* at 106], but Plaintiff alleged, "in midst of post-op surgery have been transferred [back to LLCC] with packing and have open wound stitches still in." [DE 13-1 at 53]. He does not allege that he suffered any damage, such as an infection, after this transfer.

## II.   Motion to Dismiss for Lack of Prosecution

Defendants move to dismiss for lack of prosecution based on Plaintiff's untimely filed pretrial memorandum.   [DE 57 at 1046-48].   Under Federal Rule of Civil Procedure 41(b) and a defendant may move to dismiss a claim "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order." Fed. R. Civ. P. 41(b).   The Court Ordered Plaintiff to file a pretrial memorandum by August 6, 2021.   [DE 53].   Plaintiff filed a Pretrial Memorandum that the prison posted on August 13, 2021.   [DE 55 at 886-87].   Because Plaintiff is incarcerated, the "prison mailbox rule" applies; that is, his pleading is "filed" at the time it is delivered to prison officials for mailing to the Court.   *Houston v. Lack*, 487 U.S. 266, 276 (1988); *Lyons-Bey v. Pennell*, 93 F. App'x 732 (6th Cir. 2004) (prison mailbox rule also applies to responses filed in civil suits).   Focusing on the pleading's stamp date "overlooks the 'prison mailbox

---

[7]   Meatoplasty is surgery to make the opening into the ear canal larger.   www.saintlukeskc.org/health-library/mastoidectomy-and-meatoplasty.
[8]   Otorrhea is any discharge that comes out of the ear.   www.webmd.com.

rule.'" *Brand v. Motley*, 526 F.3d 921 (6th Cir. 2008). Absent contrary evidence, the "handing-over" occurs on the date the pleading was signed. *Id.* at 925 (internal citation omitted). While the date below McNichols' signature is difficult to discern, he asserts that he sent the "paper on every deadline," and the Court finds this reasonable, absent contrary evidence. [DE 62 at 1953]. The Court thus **DENIES** Defendants' Motion to Dismiss for Lack of Prosecution.

### III. Motion for Summary Judgment

#### A. Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge its burden by demonstrating the absence of evidence to support an essential element of the nonmoving party's case. *Id.* Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id.* If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Where the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. Supp. 214, 217 (E.D. Mich. 1990), *aff'd sub nom. Lucas v. Leaseway Multi-*

*Transp. Serv., Inc.*, 929 F.2d 701 (6th Cir. 1991).

The fact that Plaintiff is *pro se* does not lessen his obligations under Rule 56.   "The liberal treatment of pro se pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage."  *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted).   The Sixth Circuit has made clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a pro se litigant does not alter [this] duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment against a *pro se* plaintiff because he "failed to present any evidence to defeat the government's motion").  However, statements in a verified complaint that are based on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment. *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).

### B.  Discussion

Defendants argue that they are entitled to summary judgment on many claims because they are time-barred; that most if not all claims are barred by the Prison Litigation Reform Act (PLRA) for failure to exhaust administrative remedies; and that Plaintiff's deliberate-indifference claims fail on the merits.

In his responses, Plaintiff disputes Defendants' contention that he did not exhaust his administrative grievances.   [DE 61 at 1948].    He asserts that he "can and will prove . . .  that CCS has and did cause me to lose my hearing, that caused me pain and suffering, that I did submit my [Section] 1983 in the statute limitations and filed my grievances and followed them

through." [DE 62 at 1956].    He argues that Defendants Lyons and Jones "both denied to do there [sic] jobs correctly . . . by passing duties going through short cuts and trying to cut corners by going to closer and quicker cheaper specialist to save money instead of going back to the same specialist whom was doing the original treatments and surgeries in the first place."    [*Id.* at 1953].    He argues that Defendants violated his constitutional rights by Defendants "delaying, denying, sending me to several different outside providers instead of one ENT specialist that started doing my surgeries and treatments."    [DE 63 at 1959].    And he asserts that the Court will see that the medical records and exhibits, even those submitted by Defendants, show that dates have been "delayed/denied."    [*Id.* at 1959].    He asserts that he needs surgeries "once again due to these delays in medical treatment needs that were recommended by ENT specialist Raleigh Jones UK Hospital Kevin Potts UofL Hospital, UofL John Morris[.]"    [DE 61 at 1950].    He explains that he recently had surgery on his right ear.    [DE 62 1954].    He questions why, if there are no abnormalities, he continues to be sent to appointments anyway.    [*Id.* at 1955].    Additionally, he contends that Defendants have "fabricated alleged infractions to cover the neglect and other indifferences that [CCS] ha[s] done to cause me deafness."    [*Id.* at 1956].

Defendants' reply [DE 68] argues that Plaintiff has offered no evidence to create a genuine issue of material fact with regard to the statute of limitations or exhaustion of administrative remedies and that the undisputed material evidence precludes a finding in favor of Plaintiff on the merits of his deliberate-indifference claims.

Plaintiff attaches exhibits to his sur-reply [DE 72] which he states show that CCS did not send him back to ENT specialist Dr. Raleigh Jones to do the mastoidectomy/tympanoplasty revision surgery in February or March 2015. [*Id.* at 2025]. He again asserts that Defendants' delays are costing him his hearing in his right ear and more unwanted and needed surgeries that would have been resolved if he had continued to go to the same specialists and followed their

recommendations in the first place.   [*Id.* at 2025-26].

      i.    *Statute of limitations*

"[S]ection 1983 actions in Kentucky are limited by the one-year statute of limitations found in [Ky. Rev. Stat.] section 413.140(1)(a)." *Collard v. Kentucky Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990).   Though the applicable statute of limitations is determined by state law, the "date on which the statute of limitations begins to run in a § 1983 action is a question of federal law."   *Eidson v. State of Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (citing *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 519 (6th Cir. 1997)).   This occurs when a plaintiff "clearly had reason to challenge what he believed to be deliberate indifference to his serious medical need." *Hawkins v. Spitters*, 79 F. App'x 168, 169 (6th Cir. 2003).   And the Sixth Circuit has held that the "statute of limitations begins to run when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred." *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007) (citations and internal quotation marks omitted).   This inquiry is objective and the court looks "to what event should have alerted the typical lay person to protect his or her rights." *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000);   *J. Geils Band Emp. Ben. Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1254 (1st Cir. 1996)   (noting that the objective standard is the appropriate test for determining a "date of discovery"); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987) ("[T]he extent to which a plaintiff used reasonable diligence is tested by an objective standard").   This is known as the "discovery rule."   *See Mounts v. Grand Trunk W. R.R.*, 198 F.3d 578, 582 (6th Cir. 2000) n. 3 (6th Cir.2000)  (noting that the discovery rule has been applied to claims under § 1983);   *United States v. Kubrick*, 444 U.S. 111, 123–24 (1979) (finding that plaintiff's claim accrued when he knew of the injury and its cause); *Hicks v. Hines Inc.*, 826 F.2d 1543, 1544 (6th Cir. 1987) (explaining that courts apply the "discovery" rule to tort causes of action "if the injured person sustains an injury which cannot itself reasonably be discovered, or the cause of

which cannot reasonably be discovered, until some time following the tortious event and the running of the statute of limitations").

Under the prisoner mailbox rule, a civil action is deemed filed on the date that it is deposited in the prison mail system for mailing. *See Richard v. Ray*, 290 F.3d 810, 813 (6th Cir. 2002) (holding that the "mailbox rule" "applies to civil complaints filed by pro se petitioners incarcerated at the time of filing").   Therefore, Plaintiff filed his original complaint on November 2, 2017, the date that he certified that he placed his complaint in the prison mail system.   Typically, any of Plaintiff's claims related to events occurring before November 2, 2016, are barred by the statute of limitations.   However, Plaintiff's hearing was progressively deteriorating, and it is not clear that he would have known of his cause of action until October 19, 2017, when he was diagnosed with "profound deafness."  [DE 13-4 at 135].

Defendants attach an affidavit from Defendant Jones to the summary judgment motion averring that she has not been employed by CCS or worked at any prison or jail facility since, at the latest, February 15, 2015.  [DE 57-2].   But this fact alone cannot time bar the claims against her, as Plaintiff's claims could not accrue until he was aware of them.   Similarly, awareness of the delay in his 2015 surgery does not bar this claim; rather, awareness of the injury from this delay—which the Court finds was likely in October 2017—would result in running the statute of limitations.   Thus, the Court assumes Plaintiff's claims were tolled until October 2017 and finds his claims are not barred by the statue of limitations.

ii.   *Administrative Remedies*

Defendants argue they are entitled to Summary Judgment because Plaintiff failed to exhaust his administrative remedies.  [DE 57 at 1051-53].   The grievance records submitted by Defendants are certified to be true copies [DE 57-4 at 1209], and Defendants assert that Plaintiff has not exhausted his administrative remedies.  [*Id.*].   But Defendants' support their assertion by submission of

grievances and appeals with Court without explanation of how the Court should review these grievances and know Plaintiff has failed to exhaust his administrative remedies.  [*See* DE 57 at 1051-53; *and* DE 57-6 at 1428-40; 57-7 at 1541-66; 57-8 at 1568-1668]; *and Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449 (6th Cir. 2008) (discussing on appeal from summary judgment, "[i]t is not the district court's (or our) duty to search through the record").   In fact, Defendants' own argument fails to identify which claims are barred by failure to exhaust, but rather argues that "most, if not all, of Plaintiff's claims are barred by the PRLA for failure to exhaust."  [DE 57 at 1051].  Furthermore, even if the Court were inclined to search through the record to determine which, if any, of the claims were barred by failure to exhaust, some of the grievance documents are redacted.  [*See* DE 57-8].  What is clear to the Court from the grievance record is that is that Plaintiff submitted numerous grievances and appeals of grievances.  The Court cannot find Plaintiff's claims are barred by failure to exhaust from the record at this time.

### iii. *Merits of deliberate-indifference claims*

#### a. Eighth Amendment standard

A prison official exhibits deliberate indifference in violation of the Eighth Amendment by, among other things, intentionally denying or delaying access to medical care.  *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).   An Eighth Amendment medical claim has both an objective and a subjective component. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).   "The objective component requires the existence of a 'sufficiently serious' medical need." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 834).   For the subjective component, the prisoner must show that the "defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Comstock v. McCrary*, 273

F.3d 693, 703 (6th Cir. 2001)).   As the Sixth Circuit Court of Appeals has opined:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference. *See Estelle*, 429 U.S. at 107–08.  Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839–40).

*Id*. at 738.

> As to delays in medical treatment, the Sixth Circuit recently explained that:

> [w]hen the plaintiff alleges a delay in treatment for a medical condition that is minor or not obvious, "the plaintiff must 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'" *Santiago*, 734 F.3d at 590 (quoting *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001)).   But "[w]here the seriousness of a prisoner's needs for medical care is obvious even to a lay person . . . the delay alone in providing medical care creates a substantial risk of serious harm." *Blackmore*, 390 F.3d at 899.

*Theriot v. MacLaren*, No. 21-2596, 2022 WL 2161391, at *2 (6th Cir. Mar. 16, 2022).

### b. Eighth Amendment Discussion

Before addressing the individual claims asserted by McNichols, the Court addresses Defendants' argument that they are entitled to Summary Judgment because "a court will not second-guess the judgment of the medical professionals providing such treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011).  However, a plaintiff may overcome this presumption by showing that such "treatment" was "so woefully inadequate as to amount to no treatment at all." *Id.*  And this argument sidesteps McNichols' actual claims, that Defendants delayed his treatment, turned a blind eye to his sick call requests, and fabricated evidence in his medical records. *See Kindoll v. S. Health Partners*, No. CV 17-84-DLB-CJS, 2019 WL 1409842, at *11 (E.D. Ky. Mar. 28, 2019) ("Defendants' [*Alspaugh*] argument sidesteps the evidence that the County was aware of a continuing pattern of delay in securing acute care.").  Defendants' argument on this point "fall[s] short of satisfying their burden of showing the absence of any genuine issues of material fact that a municipal policy or custom was the driving force a deprivation of Plaintiff's constitutional right to medical

care." *Id.* (citing *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003)).

### 1. Claims that Defendants transferred Plaintiff to delay treatment

Plaintiff alleged that a scheduled surgery did not occur because he was transferred to LLCC at the end of 2014. [DE 13-1 at 51-52]. He alleged that CCS and Jones were responsible for the delay in treatment and scheduling. [*Id.*]. Plaintiff also alleged that he was transferred from LLCC to KSR in December 2016 in the midst of treatments. [*Id.* at 52-53]. Plaintiff appears to be alleging that Defendants were responsible for this transfer as well. [*Id.*].

Plaintiff has placed significant medical evidence in the record supporting delay in treatment. The record shows that Plaintiffs' surgeries were likely delayed due to transfers. [DE 13-3 at 72 ("needs revision mastoidectomy and tympanoplasty in late February. Very important." (emphasis in original)); DE 59 at 1698 ("discussed with him that the transfer from LLCC to KSR may have caused some delay in his return to UofL ENT"). And the record supports that Defendants could be responsible for the transfers. For example, in one document, the "ARNP"[9] who saw Plaintiff on April 24, 2019 "explained to patient that I am responsible for placement of his referrals . . . and that I would check with scheduling on his Ophthalmology visit which was cancelled due to transportation issues." [DE 59 at 1828]. While this was signed by a different nurse than the named defendants, the Court finds it is a reasonable inference that the named defendants would also be responsible for scheduling at times they were in charge of his care. Furthermore, Plaintiff has now been diagnosed with "profound deafness," which Defendants have not shown to be unrelated to the transfers and delays. [DE 13-4 at 135].

To prevail against CCS on his claim regarding transfers, Plaintiff would have to show that the transfers were done because of a CCS policy or custom. *See, e.g.*, *Clark v. Correct Care*

---

[9]ARNP stands for "advanced Registered Nurse Practitioner." https://medlineplus.gov/ency/article/001934.htm.

*Sols., LLC*, No. 3:18-CV-P257-RGJ, 2021 WL 1169381, at *10 (W.D. Ky. Mar. 26, 2021) (explaining that CCS is a corporate entity and "the same analysis that applies to a § 1983 claim against a municipality applies to a § 1983 claim against . . . CCS" (citing *St. v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996)).    This is so because a municipality cannot be held responsible for a constitutional deprivation unless there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.    *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *Deaton v. Montgomery Cnty., Ohio*, 989 F.2d 885, 889 (6th Cir. 1993).   To demonstrate municipal liability, a plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). The policy or custom "must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994) (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981) (citation omitted)).   The standard for bringing a § 1983 claim against a municipality is a "high bar[,]" and "[a] *Monell* claim that survives summary judgment is exceedingly rare." *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 541–42 (6th Cir. 2018); *see also North v. Cuyahoga Cnty.*, 754 F. App'x 380, 392 (6th Cir. 2018) (holding that the inmate failed to show "the kind of widespread, gross deficiencies that would support a finding" of municipal liability).

Plaintiff has offered his medical records as evidence that CCS had a custom of transferring him to different prisons or to different specialists to delay treatment. First, the court notes that, based on these records, Defendants were aware—or should have been aware—of Plaintiff's medical needs. Thus, the Court finds the requisite objective intent—deliberate

indifference to serious medical need—is met here, which the parties do not dispute.[10]   *See* [DE 57 at 1060-63]; *Taylor v. Boot*, 58 F. App'x 125, 126 (6th Cir. 2003) ("[a] prison official acts with deliberate indifference if he knows of a substantial risk to an inmate's health, yet recklessly disregards the risk by failing to take reasonable measures to abate it." (citing *Farmer*, 511 U.S. at 837–47)).   Defendants also do not dispute that Plaintiff needed surgery for his ears, or that surgeries were delayed due to his transfers between facilities.   Defendants do dispute that they caused Plaintiff to be transferred.   But Defendants do not submit any evidence suggesting they did not cause him to be transferred, or that someone or something else was the cause of McNichols' transfer.[11]

Furthermore, it is not clear that the delays in treatment were only isolated occurrences or that they affected only Plaintiff.   The evidence in the record indicates that Plaintiff was transferred on at least two occasions that delayed his treatment.   And Plaintiff's medical records indicate that the delay in treating Plaintiff's chronic ear condition was not an isolated incident— as discussed below, Plaintiff was submitting sick call requests that do not have documented responses or treatment.   Defendants point to no specific evidence suggesting they took reasonable measure to abate the substantial risk of serious harm.   And Plaintiff is now "profound[ly] deaf[]," while he was not before.   [DE 13-4 at 135].   "In sum, [Defendants'] arguments fall short of satisfying their burden of showing the absence of any genuine issues of material fact that a municipal policy or custom was the driving force a deprivation of Plaintiff's constitutional right to medical care."   *Kindoll v. S. Health Partners*, No. CV 17-84-DLB-CJS,

---

[10] Because this analysis applies to each claim, the Court will not again analyze the objective component of intent.

[11] In their brief, Defendants cite "Ex. A at 94" to "show that many of these transfers were due to Plaintiff's own behavior."   [DE 57 at 1056].   Exhibit A references "Portions of Plaintiff's Medical Records."   [DE 57].   The Court could find no support for Defendants' assertion within Exhibit A, specifically not within any page range that could be interpreted as page 94.

2019 WL 1409842, at *11 (E.D. Ky. Mar. 28, 2019) (citing *Alkire*, 330 F.3d at 815). Whether CSS had a custom of delaying treatment remains a question "upon which a reasonable jury could find there to be a genuine fact issue for trial" and the Court denies summary judgment on this claim. *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Blackmore*, 390 F.3d at 900 (reversing summary judgment for defendants because "liability can arise and deliberate indifference can be shown by proof that the city or county 'knows that inmates face a substantial risk of serious harm and disregards the risk by failing to take reasonable measures to abate it.'" (citing *Farmer*, 511 U.S. at 847)).

With regards to subjective intent, the question is whether Defendants were "subjectively aware of the risk or had a culpable state of mind in failing to obtain [or in delaying] medical treatment for [Plaintiff]." *See Wilson v. Carroll Cnty.*, No. CIV. 12-68-GFVT, 2014 WL 897077 at *8 (E.D. Ky. Mar. 6, 2014). The question of whether an official actually perceived, inferred, or disregarded a risk is a question of fact for the jury "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478 (6th Cir. 2014) (citing *Farmer*, 511 U.S. at 842; *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006). The Court finds the circumstantial evidence, as discussed, gives rise to an inference of subjective intent for each Defendant exists here sufficient to submit a case to the jury.[12]

### 2. *Claim that Defendants turned a "blind eye" to his sick call requests*

Plaintiff has alleged that Defendants did not see him within the "sick call protocol" time frame. [DE 13 at 43]. Defendants argue they are entitled to summary judgment on this claim

---

[12] The Court finds this analysis of subjective intent, like the objective intent analysis, applies to each claim, and the Court will not again analyze the subjective component of intent.

because "Plaintiff does not point to evidence to support his allegation." [DE 57 at 1062].

Firstly, the Court notes that, on summary judgment, the burden lies first with the moving party: Defendants. Plaintiff has submitted significant medical evidence in the record, including for example relevant to this claim, a medical note from Defendant Lyons from July 13, 2017, stating: "[Plaintiff] argues 'why haven't you seen me for the sick call?' inmate put sick call in less than 7 days ago, no acute distress noted."[13]   [DE 13-5 at 159].   He also submitted with his Amended Complaint a grievance form that includes "put several sick call slips in but not being seen." [DE 13-6 at 182].

To support their argument, Defendants' point to a document that notes "workflows have been developed to improve efficiency." [DE 57-4 at 1286].  The same document, however, notes that "the expectation is for sick call slips to be triaged within 24 hours and if referred to a provider those patients be seen within 72 hours." [*Id.*].  This suggests that Plaintiff's allegation is accurate, Defendants were not following the sick call protocol and should have seen him within 72 hours.  Furthermore, this document contains a "record review" for McNichols' sick call slips.  [*Id.* at 1285–86].  The review indicates there is missing information, as indicated by "not noted" in numerous places.  For example, McNichols placed a sick call slip on August 26, 2017.  [*Id.*].  The date received by Medical is "not noted," the complaint is "earpain, draining," the date triaged is "not noted," the action taken is "not noted," and the date seen by provider is "not seen."  [*Id.*]  This missing information is indicative of both 'turning a blind eye' to Plaintiff's sick call requests—that is, a lack of care—and of a delay in treatment.  *Duckett v. Cumberland Cnty. Sheriff Dep't*, No. 2:18-CV-00024, 2019 WL 1440635, at *3 (M.D. Tenn. Apr. 1, 2019) ("prison medical personnel may be deliberately indifferent to a prisoner's serious

---

[13] That medical note also documented, "Inmate has made threats to this writer and other staff.  Inmate has been discharged from UofL ENT practice for writing threatening letters to staff at that office." [*Id.*].

medical needs 'in their response to a prisoner's needs' or lack thereof or by 'interfering with treatment once prescribed.'" (citing *Estelle*, 429 U.S. at 104–05; *and Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998)).  Defendants have not carried their burden and shown that there is no genuine dispute as to any material fact and the Court thus denies summary judgment on this claim.

### 3. Alleged fabrication of evidence

Plaintiff alleges that Defendants delayed his treatment by placing fabricated documents in his medical file.  He supports this primarily with handwritten notes on some of the copies of medical records he submitted.   *See, e.g.*, [DE 13-5 at 159 (progress notes from Defendant Lyons on which Plaintiff has written notes such as "lie"; "never received"; "all fabricated documents"; "never happen").].  Plaintiff alleged in his amended complaint that he "'supposedly' had written a threatening letter to UofL physicians, then it went to threatening staff while at Dr. visit.   None of this occurred."   [DE 13-1 at 53].  He further alleged that none of this was true because if it was "then UofL physicians would never [have] recommended I come back when I got out of [prison]."   [*Id.*].  For example, Plaintiff attaches a medical note from Defendant Lyons dated July 13, 2017, stating that Plaintiff had been "discharged from UofL ENT for writing threatening letters to staff in that office."  [DE 13-5 at 146].   Plaintiff offers protestations of innocence in his amended complaint, which is verified, and statements in a verified complaint that are based on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment. *See Weberg*, 229 F.3d at 526.

Again, Defendants argue only that they are entitled to summary judgment on the merits of this claim because Plaintiff has failed to provide evidence of his claim.  But the burden at this stage is first on Defendants as the moving party, and the Court must make all reasonable inferences in favor of the nonmoving party.  Defendants do not attach any of the threating letters

to their motion, nor do they attach any other specific evidence showing that any of the alleged fabrications are true, or demonstrate through any other method why Plaintiff would be unable to prove his claim.  Even assuming Plaintiff has failed to provide evidence, Defendants have failed to first meet their own burden of showing there is no genuine dispute of material fact.  As such, Defendants have failed to demonstrate they are entitled to summary judgment.  *Celotex*, 477 U.S. at 323; *Lucas*, 738 F. Supp. at 217.

### VI.      CONCLUSION

For the reasons stated, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that

1. Defendants' Motion to Dismiss for Failure to Prosecute [DE 57] is **DENIED**;

2. Defendants'  Motion for Summary Judgment [DE 57] is **DENIED**.

Rebecca Grady Jennings, District Judge

United States District Court

October 5, 2022

cc:      Plaintiff, *pro se*
        Counsel of record